# UNITED STATES BANKRUPTCY COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION
### www.flmb.uscourts.gov

IN RE:

Zonnie Clifton Singleton, Jr.,　　　　　　　　　　Case No. 19-02708-KJ
　　　　　　　　　　　　　　　　　　　　　　　　Chapter 7
　　　Debtor.
_____/

Alliant Tax Credit VIII and
Alliant Tax Credit Fund VIII. Ltd.,

　　　Plaintiffs,

v.
　　　　　　　　　　　　　　　　　　　　　　　Adv. Proc. No. _____

Zonnie Clifton Singleton, Jr.,

　　　Defendant.
_____/

## **ALLIANT'S COMPLAINT OBJECTING TO DISCHARGE OF DEBTOR**

Creditors, Alliant Tax Credit VIII and Alliant Tax Credit Fund VIII. Ltd. ("Alliant"), by and through undersigned counsel and pursuant to 11 U.S.C. §727, hereby file this complaint objecting to the entry of discharge in the above-captioned case of Debtor, Zonnie Clifton Singleton, Jr. (the "Debtor") and, in support thereof, Alliant states as follows:

1. The Debtor, an individual, filed a voluntary petition under Chapter 7 on April 24, 2019.

2. In his initial summary of assets and liabilities (Doc. 13), the Debtor listed his total liabilities as $3,571,393. Of these, Alliant is the unsecured judgment creditor based on a judgment for $3,569,043,[1] no part of which has ever been paid. The present bankruptcy is, in effect, solely to avoid Alliant's judgment.

3. This adversary proceeding is initiated in accordance with Rule 7003 of the Federal Rules of Bankruptcy Procedure. This is an adversary proceeding objecting to discharge of the debtor pursuant to 11 U.S.C. § 727.

4. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§157, 1334 and 11 U.S.C. § 727. This is a core proceeding under 28 U.S.C. § 157.

5. Alliant received a judgment against the Debtor for $3,569,043 on January 28, 2013. This judgment was based on the Debtor's defaulting on his obligations in a construction project and stemmed from litigation commenced in 2002, Circuit Court in Brevard County, Florida. Case No. 05-2002-CA-8851. That judgment is attached as Exhibit A.

6. The Debtor has actively concealed his assets to hinder or delay Alliant's ability to collect on its judgment. This pattern has continued in the omissions/misrepresentations by the Debtor in his bankruptcy petition, schedules, and testimony at his 2004 Examination. Further, as described below, the Debtor

---

[1] This judgment has been accruing statutory interest since 2013 and is now well over $4,000,000.

lives in a house on the water, and runs a company expected to take in between $3,000,000 and $7,000,000 in revenue in this year alone. But the Debtor has concealed his assets and income by titling all these things in the names of fraudulent transferees. The Debtor has gone so far as to organize his finances whereby he does not even have a bank account, despite access to and benefit of substantial assets.

**Concealing assets before filing bankruptcy.**

7. Prior to filing the present bankruptcy, the Debtor was entitled to ownership of multiple entities related to two retirement community construction projects, Lexington Park Senior Apartments ("Lexington Park") and Saddlebrook Senior Apartments ("Saddlebrook").

8. The Debtor was entitled to 60% of the profits from each of these projects. Said projects are now generating profits in excess of $400,000 each year. The other 40% of the profits belonged to the investor in Lexington Park and Saddlebrook, David Douglas.

9. The Debtor was entitled to these profits as result of his ownership, membership, or participation in the following entities (among others, the "Lexington and Saddlebrook Entities"):

    a.    ZCS Saddlebrook Housing Partners, LP, a Tennessee limited partnership,
    b.    ZCS Lebanon L.P., a Tennessee limited partnership,

      c.      ZCS Senior Housing Partners, Inc., a Florida corporation,

      d.      S&D Development Company, LLC, a Maryland limited liability company,

      e.      Lexington Park Senior Housing, LP, a Maryland limited partnership,

      f.      ZCS Lexington Park, LP, a Maryland limited partnership

10. In the Debtor's 2004 examination, the Debtor's testimony was that his interest in these entities was lost, given away, or forfeited at least ten years prior to the filing in this case. The debtor's wife testified similarly. This is consistent with a historical pattern of concealing information regarding the Saddlebrook and Lexington Park projects from Alliant in its post-judgment discovery since 2013.

**False claims or filings in this case.**

11. The Debtor was confronted with documentary evidence contrary to his testimony, that the Debtor signed a promissory note to David Douglas for nearly $2,000,000 ($1,983,761.50) on or about March 30, 2015 related to the Saddlebrook and Lexington Park projects. The Debtor's explanation for signing this document was non-sensical.

12. On August 22, 2019, the Debtor filed an Addendum to Schedule F (Doc. 43) claiming the Debtor owed David Douglas $2,000,000. The Debtor also filed a Form 106Sum, increasing his total liabilities by $2,000,000.

13. In truth and in fact, the Debtor sold his interest in the Lexington and Saddlebrook Entities just months outside the one-year lookback window. According to documentary and testamentary evidence provided by David Douglas, Mr. Douglas paid the Debtor $50,000 to entice the Debtor to execute documents exchanging the Debtor's rights in the Lexington and Saddlebrook Entities for forgiveness of the $2,000,000 promissory note.

14. Every part of this transaction was concealed from Alliant, and was structured to hinder or delay Alliant's legitimate attempts to collect on its judgment. It was not until third party David Douglas provided Alliant with discovery that Alliant learned the truth.

15. It was not until 2017 that the Debtor executed documents to transfer his interest in the Lexington and Saddlebrook Entities to Mr. Douglas in exchange for forgiveness of the $2,000,000 promissory note. Additionally, the Debtor received $50,000 to entice him to execute the transfer documents.

16. The $50,000 payment was structured in two payments of $25,000. The Debtor asked Mr. Douglas that the checks not be in his own name, but made out to the Debtor's wife, Rita Singleton. The first check was dated April 11, 2017, the second January 23, 2018. These checks are attached as Exhibit B. The memo on the checks state "1st installment – Lexington and Saddlebrook buyout" and

"Fiinal [sic] installment – Lexington and Saddlebrook buyo[ut]," respectively. Exhibit B.

17. The Debtor's wife, Rita Singleton, testified these checks were in fact in exchange for her personal labor to David Douglas. Namely, that she selected furniture for the Lexington Park and Saddlebrook projects. This explanation is contrary to Mr. Douglas's testimony and the documentary evidence on the face of these checks.

18. In the Debtor's Schedule I, filed on May 21, 2019 (Doc 13), the Debtor stated that his wife's monthly income is $1,500 in monthly gross wages, salary, and commissions from Nexgen Framing Systems, LLC. No employment to David Douglas was listed. Thus, either Ms. Singleton's income was misstated in Doc. 13, or these payments constituted a fraudulent transfer to Ms. Singleton.

19. Ms. Singleton's testimony in her 2004 examination in this case was that these funds were subsequently transferred to the family business, Nexgen Framing System, LLC, for no consideration. This too may constitute a fraudulent transfer, from the Debtor, to his wife, to an entity he controls.

**Nexgen is structured as a scheme to hinder or delay creditors.**

20. On paper, Nexgen Framing System, LLC, Nexgen Framing Solutions LLC, and Nexgen Framing Solutions, LLC (collectively "Nexgen") are controlled by Rita Singleton (the Debtor's spouse) and David Luce. However, upon

information and belief, the Debtor controls Nexgen and benefits financially from it. Alliant has tried diligently to obtain discovery from Nexgen, Rita Singleton, and David Luce.

21. Both purported principals, David Luce and Rita Singleton, testified in their 2004 examinations that the Debtor's wife, Rita Singleton, in fact receives no wages, salary, or commissions. Ms. Singleton's testimony (matching the Debtor's prior testimony) was effectively that she treats the Nexgen accounts as her personal piggy bank. Whenever Ms. Singleton or the Debtor have household expenses, she pays them from the Nexgen accounts, though her testimony was inconsistent on this account.

22. The testimony of the Singletons' daughter, Patricia Denise Sorrell, who works as the bookkeeper for Nexgen, is that the Singletons regularly use Nexgen funds for personal travel. Her testimony was that the Singletons travel roughly six (6) times a year using Nexgen funds. While these are purported business trips to places like Key West, where they visited in October or November 2019, it is unclear what business purpose these trips could serve. The testimony of Nexgen's vice-president Todd Wright was that when a job is ongoing, crew leaders supervise the work. Financial records from this most recent trip have not been provided, but 2019 business records reflect typical transactions like $118.22 at the

Sunset Grill and $181.84 at the Lighthouse Grill, both on January 15, 2019, and $83.06 at the Florida Keys Steakhouse on January 16, 2019. Exhibit K.

23. Regardless, the Debtor made a false oath or account, and presented or used a false claim, when he stated that his wife receives $1,500 per month from Nexgen and that he owes $2,000,000 to David Douglas.

24. Financial records show that the Debtor's wife, Rita Singleton, regularly receives transfers much larger than the $1,500 reflected in the Debtor's testimony. She received $12,000 in January 2019, $7,700 in February 2019, $2,500 on April 15, 2019, $5,000 on April 19, 2019, and $2,000 on May 21, 2019. Nexgen's 2018 and 2019 Transaction List are attached as Composite Exhibit K. Records from 2018 show even larger transfers to Ms. Singleton. She received $10,000 on March 31, 2018, $28,600 on April 30, 2018, and $15,000 on August 22, 2018.

25. Further, the entire structure of Nexgen in Rita Singleton's name appears to constitute a series of transfers calculated to hinder or delay Alliant or other creditors.

26. For instance, the Debtor has made the laughable claim that he has no debit card, and no bank account. However, Ms. Sorrell's testimony is that the Debtor regularly uses Nexgen debit cards issued to Rita Singleton and to the

Debtor's son, Clifton Daniel Singleton, to make purchases. Further, it is the Debtor himself that tracks the spending on each debit card issued by Nexgen.

27. The Debtor falsely stated during his 2004 examination that he had never held an interest in Nexgen. In truth and in fact, the Debtor was the sole managing member in Nexgen Framing System, LLC, according to that company's filing with the Secretary of State that year. The annual report of Nexgen Framing System, LLC for 2011 is attached as Exhibit C.

28. The following year, in 2012, the Debtor's interest had been transferred to his wife, Rita Singleton. The annual report of Nexgen Framing System, LLC for 2012 is attached as Exhibit D. There was no consideration paid for this transfer.

29. Purportedly, Rita Singleton runs the company, and handles the day-to-day operations of Nexgen. However, it is the debtor that created the intellectual property of the company, negotiates and signs contracts on its behalf, and serves as Nexgen's public face.

30. Nexgen Framing System, LLC appears to be operated entirely by, and apparently for the benefit of, the Debtor. In a previous deposition, the Debtor testified that he was not employed, but that he merely "assist[s]" his wife Rita Singleton in her business, Nexgen. Exhibit G, at P. 10-11. The Debtor testified that he merely helped out with sales, and worked "for nothing. Free, free, free." Exhibit G, at P. 55. However, Singleton presents himself to the public as "CEO"

of Nexgen Framing System. See Printout of Singleton's LinkedIn profile, dated Dec. 5, 2016, attached as Exhibit I. When Nexgen Framing System enters into contracts with home builders, the Debtor is represented as "chairman" and apparently signs contracts on behalf of Nexgen Framing System, LLC. See Contract, attached as Exhibit J, at P. 1, 11-12. The Debtor has traveled to Iraq and Ethiopia to make sales calls on behalf of Nexgen. Exhibit G, at P. 66-68. The Debtor speaks fluently and intelligently about the technology and effect of Nexgen's products and is periodically interviewed at home shows regarding same.

31. The Debtor was a general contractor for decades, involved in several large companies, and was responsible for establishing a byzantine corporate structure for the Lexington Park and Saddlebrook projects. As described below, the Debtor was listed as the chief inventor for Nexgen's only Patent.

32. When Nexgen courted an investor, David Luce, who has to date invested between $1,400,000 and $1,600,000 in Nexgen, the Debtor's testimony was that this investment was made on the understanding that the Debtor would continue on in the business.

33. By contrast, the Debtor's wife Rita Singleton has apparently little or nothing to do with the day to day operations of Nexgen. When the Debtor conducts public trainings and sales presentations for homeowners on behalf of Nexgen, he introduces Rita Singleton as his assistant.

34. Similarly, Rita Singleton in her 2004 examination on October 24, 2019, she could not identify key employees, could not identify Nexgen's largest suppliers, could not explain basic finances, could not explain the hiring, firing, or manufacturing process, and appeared to have, at best, a cursory understanding of the workings of the business. Mrs. Singleton had no meaningful explanation of why the company's sales nearly tripled in three years, from roughly $670,000 in 2016 to $1,975,000 in 2018 (according to Nexgen's tax returns). The company is anticipated to report revenue of roughly $3,000,000 this year, with no meaningful explanation from Mrs. Singleton.

35. Nexgen's bookkeeper, Ms. Sorrell, testified that while Ms. Singleton makes out all the checks from Nexgen Accounts, it is the Debtor who often calculates the amount of the checks and instructs Ms. Singleton in how to make them out.

36. The only other purported principal of Nexgen, David Luce, by all accounts has nothing to do with day-to-day operations. However, Mr. Luce speaks daily to Todd Wright, and integrally participates in Nexgen's financial decisions.

37. Nexgen, the Debtor, David Luce, and Rita Singleton have strenuously objected to discovery in this case, have failed or refused to produce responsive documents, and have concealed the financial state of the company and transfers to the Debtor.

38. Alliant is informed and believes that substantial assets are regularly transferred to or are within the control of the Debtor, and that these assets are being actively concealed even today. For instance, the gross profit reporte by Nexgen on its tax returns is generally between 35% and nearly 50%, though the company purports not to make a profit. Thus, voidable transfers of between $1,000,000 and $1,500,000 may be taking place this year. In the past, the company has made unexplained "guaranteed transfers to partners" of up to $88,000 per year.

39. Even the records available, while ambiguous, are highly suspicious. For example, Nexgen's 2018 tax return, the most recent available, shows total revenue of $1,975,698. However, Nexgen's bank records from 2018 appear to reflect total receipts of $2,799,709.52. By all accounts, Nexgen uses cash based (not accrual based) accounting.

40. Even more suspect, Nexgen's transaction list for 2018 reflects total debits and total credits of $6,711,468.88 each. Nexgen's bookkeeper, Ms. Sorrell, had no explanation for these substantial, multi-million-dollar discrepancies. Upon information and belief, these discrepancies represent active concealment of substantial assets under the control of the Debtor.

41. Rita Singleton, who purportedly runs the company's finances, stated Ms. Sorrell would be in the best position to answer questions about Nexgen's finances. However, Ms. Sorrell's testimony was that the Debtor himself manages

the company's finances, along with Todd Wright, and David Luce. Further, the Debtor maintains his own financial records on a computer in the office he shares with Ms. Singleton. No such records have ever been provided to Alliant.

42. Thus, while the Debtor apparently runs and operates Nexgen, Rita Singleton benefits from the profits of Nexgen. Exhibit G, at P. 58-59. Rita Singleton pays all or substantially all of the Debtor's expenses from these profits. Exhibit G, at P. 78, 81.

43. Further, the Debtor uses Nexgen to support his family. In addition to the Debtor and Rita Singleton, their daughter works as the bookkeeper despite her testimony she has no training or experience in that role. Similarly, the Debtor's son, Clifton Daniel Singleton, receives $500 per month, but does not work in the company. The Debtor's grandchildren are likewise employed by Nexgen and on the payroll.

**The Debtor's intellectual property was transferred without consideration.**

44. On May 17, 2013, the Debtor executed a patent assignment to patent number 9,624,666, issued April 18, 2017, for a structural paneling system (the "Patent", printout from USPTO attached as Exhibit E). The Patent was assigned to NexGen Framing Solutions I, and subsequently to NexGen Framing Solutions II in 2018. See Affidavit of NexGen Framing Solutions I, at para. 3, attached as Exhibit F.

45. In July, 2018 the Patent was assigned to NexGen Framing Solutions II, an entity entirely owned and controlled by David Luce. The Debtor's testimony was that previously NexGen Framing Solutions I was solely owned by NexGen Framing System, LLC.

46. These transactions were actively concealed by the Debtor in Alliant's post-judgment discovery. The Debtor, in a previous deposition duces tecum on April 29, 2015 refused to tender any documents related to patents and claimed not to have any interest in any patents. See Transcript at P. 69-70, attached as Exhibit G. Notably, Nexgen Framing System LLC (for which Rita Singleton serves as managing member) manufactures structurally insulated paneling, and apparently has a license for the Patent that was assigned by Singleton in 2013. See generally, Affidavit of Nexgen Framing System LLC, attached as Exhibit H.

47. The Patent is a key part of and essential asset to Nexgen's business, as it provides intellectual property protection for Nexgen's only products. By all accounts, Nexgen has no other intellectual property besides the Patent. Without the Patent, Nexgen would have no means of differentiating itself in a very competitive marketplace.

48. Additionally, recent transfers involving the Patent may constitute voidable transfers. The Patent was transferred between two companies with identical names, Nexgen Framing Solutions, sometime around July 2018.

Similarly, Notice of Recordation of Assignment were recorded with the United States Patent and Trademark Office in January, 2019. Discovery is ongoing, but this appears to be an attempt to perfect liens in the Patent, or otherwise calculated to hinder or delay Alliant's collection efforts.

### Count 1 - 11 U.S.C. §727(a)(4) – False Oath, False Claim

49. Alliant incorporates paragraphs 1-48 above as though restated herein.

50. The Debtor knowingly and fraudulently, in or in connection with the case, made a false oath or account, and presented or used a false claim.

51. The Debtor misstated his and his wife's income from and roles in Nexgen in his Schedules (Doc. 13), thereby making a false oath or claim.

52. The Debtor made a false oath or claim in his Addendum to Schedule F (Doc. 43), by representing he owed $2,000,000 to a creditor he had settled with in a fraudulent transfer.

53. The Debtor knowingly and fraudulently made a false oath during his 2004 Examination on July 22, 2019, based on representations he made regarding his previous ownership interest in NexGen, his current involvement in Nexgen (including high-level involvement in Nexgen's financial recording keeping), his access to Nexgen funds, his wife's current involvement in Nexgen, his wife's income from Nexgen, and the timing of the Lexington Park and Saddlebrook

transaction and material details related thereto. He further failed to disclose income received from the Lexington Park and Saddlebrook transactions.

WHEREFORE, the Creditors, Alliant Tax Credit VIII and Alliant Tax Credit Fund VIII. Ltd., respectfully request this Court enter judgment denying the discharge of the Debtor, Zonnie Clifton Singleton, Jr., and grant such further relief as this Court deems just and proper.

### Count 2 - 11 U.S.C. § 727(a)(2) – Fraudulent Transfers[2]

54. Alliant incorporates paragraphs 1-48 above as though restated herein.

55. The Debtor, with intent to hinder, delay, or defraud a creditor (namely Alliant) or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed property of the Debtor, within one year before the date of the filing of the petition.

56. As described above, transfers from Nexgen regularly appear to be benefiting the Debtor (directly or indirectly) and transfers are controlled by the Debtor. Discovery is ongoing, appropriate financial discovery will reveal each such transfer.

---

[2] Alliant reserves the right to amend its complaint to assert claims against fraudulent transferees, namely Nexgen Framing System, LLC, Nexgen Framing Solutions, LLC, Rita Singleton, and David Luce, Blue Devil 83 LLC, Patricia Denise Sorrell, Clifton Daniel Singleton, and Lisa Singleton.

WHEREFORE, the Creditors, Alliant Tax Credit VIII and Alliant Tax Credit Fund VIII. Ltd., respectfully request this Court enter judgment denying the discharge of the Debtor, Zonnie Clifton Singleton, Jr., and grant such further relief as this Court deems just and proper.

RESPECTFULLY SUBMITTED this 10th day of February, 2020.

>*/s/ Kevin A. Forsthoefel*
>Kevin A. Forsthoefel
>Florida Bar No.:  092382
>Ausley McMullen
>123 South Calhoun Street (32301)
>Post Office Box 391
>Tallahassee, Florida  32302
>(850) 224-9115; Fax: (850) 222-7560
>kforsthoefel@ausley.com