Case 6:20-ap-00012-LVV    Doc 1-7    Filed 02/10/20    Page 1 of 8

CLIFF SINGLETON                                                                April 29, 2015
SINGLETON vs. ALLIANT CAPITAL                                                         1–4

## Page 1

```
 1     IN THE CIRCUIT COURT OF THE EIGHTEENTH JUDICIAL CIRCUIT
            IN AND FOR BREVARD COUNTY, FLORIDA
 2           CASE NO:   05-2002-CA-8851
 3
 4   Z. CLIFF SINGLETON,
 5      Plaintiff,
 6   vs.
 7   ALLIANT CAPITAL,
     LTD, et al.,
 8
        Defendants.
 9
     _____/
10
11
12          DEPOSITION OF CLIFF SINGLETON
13
14          Wednesday, April 29, 2015
             10:00 a.m. - 11:50 a.m.
15
16              2955 Pineda Plaza Way
                 Melbourne, Florida
17
18
19
20
21   Reported by:
22   Logan Brooks, Court Reporter
     Notary Public, State of Florida
23   Esquire Deposition Services
     Melbourne Office - Job 327819
24   Phone - (407) 426-7676
25
26
```

## Page 2

```
 1
 2   Appearances:
 3
 4   Telephonically On Behalf of the Defendants:
 5   STEVEN HOGAN, ESQUIRE
     Ausley & McMullen
 6   123 South Calhoun Street
     Tallahassee, Florida  32301
 7   (850) 224-9115
 8
```

## Page 3

```
 1
 2                INDEX
 3
 4   Testimony of CLIFF SINGLETON              Page
 5
 6   Direct Examination by MR. HOGAN . . . . . . . . .   4
 7
 8
 9   Certificate of Oath . . . . . . . . . . . . . . . 87
10   Certificate of Reporter . . . . . . . . . . . . . 88
11   Errata Sheet . . . . . . . . . . . . . . . . . .  89
12
13
14              - - - -
15            E X H I B I T S
16              - - - -
17
18   EXHIBIT         DESCRIPTION            PAGE
19
20   No exhibits marked
```

## Page 4

2    Deposition taken before Logan Brooks, Court
3 Reporter and Notary Public in and for the State of Florida at
4 Large, in the above cause.
5           * * * * *
6    MADAM COURT REPORTER: Mr. Singleton, do you
7    swear or affirm that the testimony you are about to
8    give will be the truth, the whole truth, and
9    nothing but the truth?
10   WITNESS: I do.
11 THEREUPON,
12        CLIFF SINGLETON,
13 having been first duly sworn or affirmed, was examined and
14 testified as follows:
15        DIRECT EXAMINATION
16 BY MR. HOGAN:
17   Q.  Good morning.
18   A.  Good morning.
19   Q.  Mr. Singleton, my name is Steven Hogan,
20 I'm with the Ausley & McMullen law firm.
21   A.  Okay.
22   Q.  Is there anybody else in the room with
23 you besides yourself and the court reporter?
24   A.  No.
25   Q.  Okay. Mr. Singleton, can you state your



Page 9

1   A.   No.
2   Q.   Mr. Singleton, are you represented today
3 by an attorney?
4   A.   No.
5   Q.   Have you spoken with anyone about today's
6 deposition?
7   A.   No.
8   Q.   Mr. Singleton, you gave us your name
9 earlier in the deposition. Have you ever been known by
10 any other name?
11   A.   Z. Cliff Singleton.
12   Q.   Okay. But no other aliases or other
13 names?
14   A.   No.
15   Q.   Mr. Singleton, where do you live? What
16 is your address?
17   A.   I live in Melbourne. 402 La Costa
18 Street, Melbourne Beach, Florida.
19   Q.   Is that a house? Is that an apartment?
20 Is that a condo?
21   A.   It's a townhouse.
22   Q.   Townhome? Okay. Do you live with anyone
23 there or do you live by yourself?
24   A.   I live with my wife.
25   Q.   What's your wife's name?

Page 10

1   A.   Rita.
2   Q.   Rita Singleton?
3   A.   Yes.
4   Q.   Is that R-I-T-A Singleton?
5   A.   Yes.
6   Q.   You're married? How long have you been
7 married?
8   A.   Forty-four years.
9   Q.   Mr. Singleton, are you currently
10 employed?
11   A.   No.
12   Q.   So you're not employed at all?
13   A.   No.
14   Q.   Do you engage in any occupation or
15 profession?
16   A.   I assist my wife.
17   Q.   What does that mean?
18   A.   It means I help her.
19   Q.   Can you describe what that entails?
20   A.   Well, she has a business and I help her
21 with her business.
22   Q.   What is her business?
23   A.   I don't think that's important.
24   Q.   Mr. Singleton, this is a deposition, so
25 we can -- I'm here to ask you questions and you must

Page 11

1 answer under oath. If you have -- this is not legal
2 advice, I'm not giving you legal advice, but you can
3 object to a question if you don't think it's relevant,
4 but you still must answer.
5        So Mr. Singleton, what is her business?
6   A.   She has a manufacturing business.
7   Q.   What does she manufacture?
8   A.   Houses. Building components.
9   Q.   She manufactures houses?
10   A.   Yes.
11   Q.   Building components. What does that
12 mean?
13   A.   Components to make up a house.
14   Q.   What's the name of her business?
15   A.   NexGen Framing System.
16   Q.   How do you spell that?
17   A.   N-E-X-G-E-N.
18   Q.   Did you say Framing Systems?
19   A.   Yes.
20   Q.   Mr. Singleton, is that organized as an
21 LLC, limited liability company, or some other
22 structure?
23   A.   LLC.
24   Q.   Who are the members of the LLC?
25   A.   I object to that.

Page 12

1   Q.   That's fine, Mr. Singleton, but you still
2 must answer.
3   A.   Well, it's a matter of public record.
4 It's my wife Rita, a guy named David Luce and a guy
5 named Roy Beauchamp.
6   Q.   David Luce and Roy Beauchamp?
7   A.   Yes.
8   Q.   And David Luce, how do you spell that
9 last name?
10   A.   L-U-C-E.
11   Q.   Okay. and Roy Beauchamp. How do you
12 spell that last name?
13   A.   B-E-A-U-C-H-A-M-P.
14   Q.   And those are the only three members?
15   A.   Yes.
16   Q.   Have you ever been a member of the LLC?
17   A.   No.
18   Q.   Of NexGen Framing Systems?
19   A.   No.
20   Q.   Have you ever been in a business
21 relationship with Rita Singleton, David Luce or Roy
22 Beauchamp?
23   A.   No.
24   Q.   So just to be clear, you say that you
25 have never been in a business relationship with Rita



**Page 53**

1  or possessed by you, either individually or jointly,
2  with any other person or entity.
3      Do you understand what I just read to you?
4      A.   Yes.
5      Q.   You brought no documents with you today,
6  correct?
7      A.   Correct.
8      Q.   Have you purchased any real property in
9  the last five years?
10     A.   No.
11     Q.   Are you named as an obligee or a
12 guarantor on any mortgage documents in the last five
13 years?
14     A.   No.
15     Q.   So you're not on the hook for any
16 mortgage payments that you know of?
17     A.   No.
18     Q.   Paragraph eighteen.  We asked you for any
19 and all records, documents, internal memoranda,
20 correspondents, deeds, agreements, contracts or
21 invoices relating to the transfer of any property or
22 assets owned, controlled or possessed by you, either
23 individually or jointly, with any other person or
24 entity.
25     Do you understand what I just read to you?

**Page 54**

1      A.   Yes.
2      Q.   You brought no documents with you today,
3  correct?
4      A.   Correct.
5      Q.   And you brought no documents with you
6  today; is that correct?
7      A.   Yes.
8      Q.   Okay.  Have you transferred any property
9  or assets in the last five years?
10     A.   No.
11     Q.   So you've not transferred anything to
12 anyone in the last five years?
13     A.   No.
14     Q.   How about the last ten?
15     A.   No.
16     Q.   Paragraph nineteen.  Any and all records,
17 documents, internal memoranda or correspondents
18 relating to the formation, incorporation or corporate
19 affairs by you, either individually or jointly, with
20 any other person or entity, including, but not limited
21 to, articles of incorporation, bylaws, minutes of
22 shareholders or directors meetings, minute books,
23 resolutions, officer and director appointments or stock
24 subscription agreements.
25     Do you understand what I just read to you?

**Page 55**

1      A.   I think so.
2      Q.   Yes or no, please.
3      A.   Yes.
4      Q.   And you brought no records with you
5  today, correct?
6      A.   Correct.
7      Q.   Are you on the board of any companies,
8  Mr. Singleton?
9      A.   No.
10     Q.   Have you participated in the management
11 of any companies in the last five years?
12     A.   No.
13     Q.   Are you involved at all in the corporate
14 affairs of NexGen Building Systems?
15     A.   I help out, yes.
16     Q.   How do you help out?
17     A.   I help my wife.
18     Q.   What tasks-
19     A.   I support her.  I work for nothing.
20 Free, free, free.
21     Q.   Okay.  What type of work do you do for
22 free?
23     A.   I help her with sales.
24     Q.   With sales?
25     A.   Yes.

**Page 56**

1      Q.   You act as an outside sales person?
2      A.   Sometimes.
3      Q.   What do you do other times?
4      A.   Nothing.  That's the only -- I don't have
5  a job.
6      Q.   So your only role is to help generate
7  sales for NexGen Building Systems; is that correct?
8      A.   Correct.
9      Q.   And you were not compensated for your
10 services there; is that correct?
11     A.   Correct.
12     Q.   And your role as a sales person for
13 NexGen Building Systems, do you receive any stock or
14 options to purchase stock or membership interests that
15 would be equivalent to that?
16     A.   No.
17     Q.   So you're strictly a volunteer?
18     A.   Yes.
19     Q.   Are you successful in your sale efforts?
20     A.   It's hit and miss.
21     Q.   Do you have any hits?
22     A.   Occasionally.
23     Q.   What types of deals do you do for them?
24     A.   I do pricing.
25     Q.   So you set pricing for customers?



Case 6:20-ap-00012-LVV   Doc 1-7   Filed 02/10/20   Page 4 of 8

CLIFF SINGLETON                                        April 29, 2015
SINGLETON vs. ALLIANT CAPITAL                                  57–60

Page 57

1   A.   I work on pricing, yeah, I don't set it.
2   I do take offs, material take offs, and stuff like
3   that.
4       Q.   Forgive my ignorance about how the
5   construction industry works, but what does a 'take off'
6   mean?
7       A.   It means you take a drawing and figure
8   out what it costs to build it.
9       Q.   Okay. So when you say drawing, is that
10  like a blueprint? Again, pardon my ignorance.
11      A.   Yes.
12      Q.   Okay. So you look at a blueprint and
13  work up what it would cost to build that; is that
14  correct?
15      A.   Yes.
16      Q.   Do you communicate directly with
17  customers?
18      A.   Pardon?
19      Q.   Do you communicate directly with
20  customers?
21      A.   Yes.
22      Q.   Does NexGen have any other sales people?
23      A.   Yes.
24      Q.   Do they receive a commission when they
25  make a sale?

Page 58

1       A.   They do, yes.
2       Q.   But you do not?
3       A.   No.
4       Q.   Okay. How many other sales people do
5   they have?
6       A.   A couple dealers that sell for them.
7       Q.   A couple of dealers?
8       A.   Yeah.
9       Q.   So-
10      A.   Independent agents. Nobody works for
11  them, actually, it's just independent agents.
12      Q.   Okay. So independent agents brokering
13  deals?
14      A.   Yes.
15      Q.   Are there any other employees of the
16  company or is it just the three members and you on a
17  volunteer basis?
18      A.   No, there's another employee.
19      Q.   What does that employee do?
20      A.   Works in the shop.
21      Q.   Is that making components for sale?
22      A.   Yes.
23      Q.   You said you were not compensated. Is
24  Rita Singleton compensated directly or does she take a
25  share of the profits with the other LLC members?

Page 59

1       A.   She takes a share of the profits.
2       Q.   Does she receive a salary?
3       A.   She does not receive a salary, per se,
4   no.
5       Q.   Okay. Paragraph twenty. We asked you
6   for all records, documents, internal memoranda or
7   correspondents relating to the formation or operation
8   of any corporation, partnership, proprietorship or
9   joint venture formed by you, either individually or
10  jointly, with any other person or entity or in which
11  you have an interest.
12      Do you understand what I just read to you?
13      A.   Yes.
14      Q.   And you brought no documents with you
15  today; is that correct?
16      A.   Yes.
17      Q.   So have you formed a corporation,
18  partnership, proprietorship or joint venture or any
19  other entity in the last five years?
20      A.   No.
21      Q.   According to your tax records, you were
22  being paid by the ZCS Lexington and Lebanon entities,
23  or -- actually, let me fix that question. I'll strike
24  that question.
25      According to your tax records, you were

Page 60

1   reporting either income or loss for the ZCS Lexington
2   and ZCS Lebanon entities up through the years of 2011
3   and 2012. So were you involved in the operation of
4   those entities during those years where you were
5   reporting income or loss?
6       A.   I was not involved in them, no.
7       Q.   Did you get any reports from those
8   entities about how they were doing financially?
9       A.   I originally set them up. And I did not
10  get reports, no.
11      Q.   Okay. And you mentioned one other
12  partner in both of those entities, that would be David
13  Douglas of the Douglas company. Were there any other
14  people or companies that were involved in those
15  partnerships or was it just you and David Douglas?
16      A.   Just me and David Douglas.
17      Q.   Paragraph twenty-one. We asked you for
18  any and all records, documents, internal memoranda or
19  correspondents related to any trust created by or on
20  behalf of you, either individually or jointly, with any
21  other person or entity in which you have an interest.
22      Do you understand what I just read to you?
23      A.   Yes.
24      Q.   And you brought no records with you
25  today; is that correct?



Case 6:20-ap-00012-LVV   Doc 1-7   Filed 02/10/20   Page 5 of 8

CLIFF SINGLETON                                             April 29, 2015
SINGLETON vs. ALLIANT CAPITAL                                      65–68

Page 65

1  A.  No.
2  Q.  Paragraph twenty-six. Any and all
3  records, documents, internal memoranda or
4  correspondents relating to any investment, brokerage,
5  financial depository or bank accounts on which you are
6  a signatory, either individually or jointly, with any
7  other person or entity.
8      Do you understand what I just read to you?
9  A.  Yes.
10 Q.  You brought no records with you today; is
11 that correct?
12 A.  Correct.
13 Q.  As we discussed earlier, you do have an
14 account with Bank of America, correct?
15 A.  Yes.
16 Q.  You brought none of those records with
17 you today, correct?
18 A.  Yes.
19 Q.  Do you have accounts with any other
20 financial institution?
21 A.  No.
22 Q.  Paragraph twenty-seven. We asked you for
23 any and all records, documents, internal memoranda or
24 correspondents relating to any investments, brokerage,
25 financial depository or bank accounts held or

Page 66

1  maintained by you outside of the United States, either
2  individually or jointly, with any other person or
3  entity.
4      Do you understand what I just read to you?
5  A.  Yes.
6  Q.  And you brought no records with you
7  today; is that correct?
8  A.  Yes.
9  Q.  Do you have any bank accounts outside of
10 the United States?
11 A.  No.
12 Q.  Are you a beneficiary of any bank
13 accounts outside of the United States?
14 A.  No.
15 Q.  Okay. Have you ever been outside of
16 United States?
17 A.  Yes.
18 Q.  Do you have a passport?
19 A.  Yes.
20 Q.  When's the last time you left the
21 country?
22 A.  Maybe a year ago.
23 Q.  Where did you go?
24 A.  To Ethiopia.
25 Q.  Wow. Business or pleasure?

Page 67

1  A.  Business.
2  Q.  What was your business in Ethiopia?
3  A.  I made a sales call.
4  Q.  For what entity?
5  A.  NexGen Framing System.
6  Q.  Did you pay your own way?
7  A.  No, they did.
8  Q.  Did they pay directly or did they
9  reimburse you?
10 A.  Paid directly.
11 Q.  Did you have any expenses that NexGen
12 reimbursed you for while you were in Ethiopia?
13 A.  No.
14 Q.  So you had no expenses on this trip?
15 A.  No.
16 Q.  Did you have a corporate credit card that
17 you put your expenses on?
18 A.  No.
19 Q.  How did you pay for things when you were
20 over there?
21 A.  The cash they gave me. They don't take
22 credit cards over there.
23 Q.  Fair enough. So NexGen provided you cash
24 to use while you were in Ethiopia?
25 A.  Yes.

Page 68

1  Q.  How long were you there?
2  A.  Three or four days.
3  Q.  Did you make the sale?
4  A.  No, unfortunately not.
5  Q.  Okay. Have you gone on any other trips
6  for NexGen or for any other reason in the past five
7  years outside of the United States?
8  A.  Yes.
9  Q.  Where to?
10 A.  I went to Iraq.
11 Q.  Let me circle back to Ethiopia. When was
12 that trip? What year?
13 A.  2014.
14 Q.  And your trip to Iraq, when was that?
15 A.  I -- oh, I don't know, four, five years
16 ago.
17 Q.  Were you there for NexGen, as well?
18 A.  Yes.
19 Q.  Did NexGen reimburse you for your
20 expenses or did they pay up front?
21 A.  They paid up front.
22 Q.  Were you given cash or did you have a
23 company card?
24 A.  Cash.
25 Q.  Did you make that sale?



Case 6:20-ap-00012-LVV   Doc 1-7   Filed 02/10/20   Page 6 of 8

CLIFF SINGLETON                                              April 29, 2015
SINGLETON vs. ALLIANT CAPITAL                                       69–72

Page 69
1   A.   No, unfortunately not.
2   Q.   Globetrotter.
3   A.   I'll try anything.
4   Q.   Any other trips outside the United States
5   that you recall?
6   A.   No.
7   Q.   Does NexGen have any accounts overseas
8   that you know of?
9   A.   No.
10  Q.   Did they regularly do contracts overseas
11  or are these special occasions?
12  A.   Special occasions.  We haven't been able
13  to.
14  Q.   Are they trying to build homes out there?
15  A.   Yes.
16  Q.   Very interesting.
17       Paragraph twenty-eight.  We asked you for any
18  and all records, documents, internal memoranda or
19  correspondents relating to any patents, copyrights or
20  royalties in which you have an interest or which have
21  been paid to you, either individually or jointly,, with
22  any other person or entity.
23       Do you understand what I just read to you?
24  A.   Yes.
25  Q.   You brought no documents with you today;

Page 70
1   is that correct?
2   A.   Yes.
3   Q.   Do you own any patents?
4   A.   No.
5   Q.   Any copyrights?
6   A.   Nope.
7   Q.   Do you have the right to receive
8   royalties for any reason?
9   A.   No.  I wish I did.
10  Q.   Paragraph twenty-nine.  We asked you for
11  any and all records, documents, internal memoranda or
12  correspondents relating to any real or personal
13  property leased by or on behalf of you, either
14  individually or jointly, with any other person or
15  entity including, but not limited to, copies of all
16  leases and documents reflecting income received from
17  said leases.
18       Do you understand what I just read to you?
19  A.   Yes.
20  Q.   You brought no documents with you today;
21  is that correct?
22  A.   Correct.
23  Q.   So we've talked about Lexington and
24  Lebanon.  And you brought no records for Lexington and
25  Lebanon with you today; is that correct?

Page 71
1   A.   Yes.
2   Q.   Do you have an interest in any other
3   rental property of any kind?
4   A.   No.  You took it away.
5   Q.   What are you referring to there?
6   A.   Hatton House and Crane Creek, the subject
7   of this lawsuit.  You do know that, don't you, that
8   this is the subject of that?
9   Q.   Crane Creek, Hatton House, Lexington and
10  Lebanon entities, are there any other similar deals
11  that you are involved in currently?
12  A.   No.
13  Q.   Are there any other deals besides those
14  that you were involved in over the last five years?
15  A.   No.
16  Q.   Paragraph thirty.  We asked you for any
17  and all records, documents, internal memoranda or
18  correspondents relating to any judgments or settlements
19  involving you, either individually or jointly, with any
20  other person or entity.
21       Do you understand what I just read to you?
22  A.   Yes.
23  Q.   You brought no documents with you today,
24  correct?
25  A.   No.

Page 72
1   Q.   Besides this lawsuit, have you been sued
2   before?
3   A.   Yes.
4   Q.   Were those lawsuits reduced to a
5   judgment?
6   A.   Yes.
7   Q.   Okay.  Let's go one-by-one.
8       What's the last one besides this lawsuit that
9   was reduced to a judgment?
10  A.   I guess the law firm in Orlando.
11  Q.   What law firm?
12  A.   I can't remember the name.
13  Q.   Was the law firm-
14  A.   Rumberger.  Rumberger, I think.
15  Q.   -on behalf of someone?
16  A.   Rumberger something or another.  It was
17  regarding the attorneys fees in this lawsuit.  They
18  have a judgment for about $50,000 or something.  I have
19  no documentation.
20  Q.   That judgment is out there but you did
21  not bring a copy today?
22  A.   I don't have any records.  I don't have
23  anything.  I just know it exists.
24  Q.   So once again, you acknowledge that there
25  is a $50,000 judgment by the Rumberger law firm against



Case 6:20-ap-00012-LVV   Doc 1-7   Filed 02/10/20   Page 7 of 8

CLIFF SINGLETON                                          April 29, 2015
SINGLETON vs. ALLIANT CAPITAL                                     77–80

Page 77

1  A. No.
2  Q. Do you have a Roth Individual Retirement
3  Account?
4  A. What is that?
5  Q. It's a Roth IRA. It's a different kind
6  of IRA.
7  A. No.
8  Q. Paragraph thirty-five. We asked you for
9  any and all records, documents, internal memoranda or
10 correspondents relating to any credit cards used or
11 maintained by you, either individually or jointly, with
12 any other person or entity.
13     Do you understand what I just read to you?
14 A. Yes.
15 Q. And you brought no records with you
16 today; is that correct?
17 A. Correct.
18 Q. Do you have a credit card?
19 A. No.
20 Q. Are you an authorized user on a credit
21 card?
22 A. No.
23 Q. How do you pay for dinner when you go out
24 to dinner?
25 A. Cash.

Page 78

1  Q. So you have no card?
2  A. No.
3  Q. Do you have a debit card with Bank of
4  America?
5  A. Well, I have a debit card, yes, but I
6  don't have money in the bank, so it don't do it no
7  good.
8  Q. I'm sorry, let me ask that again. Do you
9  have a credit card with Bank of America?
10 A. No.
11 Q. Okay. We're getting close to the end
12 here, Mr. Singleton.
13 A. Good.
14 Q. Let me just ask you some follow-up
15 questions here.
16     On the house that you live in, how much is the
17 rent payment every month?
18 A. I think it's $1,800.
19 Q. So $1,800?
20 A. Yes.
21 Q. Who pays that?
22 A. My wife.
23 Q. Do you own the furnishings within the
24 home?
25 A. Yeah, with my wife does.

Page 79

1  Q. So she owns the furnishings in the home?
2  A. Yes.
3  Q. How were they paid for?
4  A. Oh, I don't know, it was before I met
5  her.
6  Q. So you moved in with her?
7  A. Yeah, 45 years ago.
8  Q. So she's been renting the house for 45
9  years?
10 A. No, she had furniture back then.
11 Q. Okay. So if I understand you correctly,
12 it's the same furnishings just moved into this house
13 that you're renting right now, correct?
14 A. Correct.
15 Q. Okay. Are those furnishings covered by a
16 security agreement, like a channel mortgage?
17 A. No.
18 Q. Or a conditional sale contract like Rent
19 to Own?
20 A. No, no. We've had it for 45 years. I
21 think they would be paid for by now.
22 Q. Do you have a renter's insurance policy?
23 A. No, not that I know of. She might have
24 it.
25 Q. So there might be a renter's insurance

Page 80

1  policy, you're not sure?
2  A. I don't think so.
3  Q. You don't think so?
4  A. No.
5  Q. Who pays for groceries, you or Mrs.
6  Singleton?
7  A. She does.
8  Q. So she pays the rent, she pays the
9  groceries?
10 A. Yes.
11 Q. What's your approximate utility bill?
12 A. I think about $100.
13 Q. That low?
14 A. That's expensive.
15 Q. Well, compared to Tallahassee, you should
16 see our bill sometimes. That's what you get with a
17 city owned utility, I think. But anyway --
18 A. You should let me build you a house then
19 you wouldn't have a utility bill.
20 Q. So about $100 a month for the utilities.
21 About how much are your grocery bills? Just an
22 estimate.
23 A. I have no idea.
24 Q. Now you mentioned earlier that you
25 receive social security payments. About how much is



Case 6:20-ap-00012-LVV   Doc 1-7   Filed 02/10/20   Page 8 of 8

CLIFF SINGLETON  
SINGLETON vs. ALLIANT CAPITAL  
April 29, 2015  
81–84

Page 81
1  that per month?
2     A.   I think it's just short of $1,000.
3     Q.   And is the social security your only
4  source of income?
5     A.   Mine, yes.
6     Q.   So it sounds like Mrs. Singleton pays
7  most of the bills; is that fair enough?
8     A.   That's fair.
9     Q.   Okay.  And is her distributions from
10 NexGen Building her only source of income?
11    A.   Well, she gets social security, too.
12    Q.   Mr. Singleton?
13    A.   Yes?  I said she has a social security
14 check.
15    Q.   So she has a social security check, as
16 well?
17    A.   Yes.
18    Q.   Approximately how much is that?
19    A.   I have no idea.  I don't think it's that
20 much.  I think it's in the $400-500 range.
21    Q.   So between her social security check, her
22 social security check and what Mrs. Singleton makes
23 from NexGen, that's the household's sole source of
24 income; is that right?
25    A.   That's right.  Yes.

Page 82
1     Q.   Now remind me, does anyone else live with
2  you?
3     A.   No.
4     Q.   So it's just the two of you?
5     A.   Yes.
6     Q.   Does anyone else help with your bills?
7     A.   No.  I wish they would.
8     Q.   So that's a no, correct?
9     A.   No.
10    Q.   Does Mrs. Singleton own any real estate
11 at all?
12    A.   Not that I know of.
13    Q.   Is she named on any mortgages either as a
14 mortgagor or a mortgagee?
15    A.   Not that I know of.
16    Q.   Beyond the two cars that you said that
17 she owns, does Mrs. Singleton own any other vehicles,
18 whether cars, boats or aircraft?
19    A.   No.
20    Q.   I'm sorry, I apologize for my phone.  Was
21 that a no?
22    A.   No.
23    Q.   Okay.  Are the cars paid off?
24    A.   Yes.
25    Q.   Are there any other recurring bills every

Page 83
1  month that you pay or that the household pays?
2     A.   I guess insurance.
3     Q.   The insurance?
4     A.   Yeah.
5     Q.   Car insurance or property insurance?
6     A.   No, health insurance.
7     Q.   Approximately how much is that per month?
8     A.   I think it's a little under $200 a month.
9     Q.   You all have cable?
10    A.   Yes.
11    Q.   How much is your cable bill a month?
12    A.   She pays that.  I don't know.  It's
13 probably -- it's probably $65-70.  I don't know.
14    Q.   Does that include Internet or do you pay
15 separately for that?
16    A.   No, we have basic.
17    Q.   So basic cable.  Do you have Internet
18 access?
19    A.   Yeah, basic Internet.
20    Q.   Is that wrapped in the same bill?
21    A.   Yeah, it's all in the same.
22    Q.   Okay.  That's a good value.
23    A.   It's the cheap plan.
24    Q.   I'm telling you.  I pay almost that and I
25 just get Internet.

Page 84
1     A.   You probably got high speed.
2     Q.   Let's see here.  We talked a lit bit
3  about your son, Clifton D. Singleton, and his
4  employment of you at S5.
5     A.   Yeah.
6     Q.   Do you have any other children?
7     A.   Yes.
8     Q.   What are their names?
9     A.   I have a daughter, her name is Patricia
10 Sorrell.
11    Q.   How do you spell that last name?
12    A.   S-O-R-R-E-L-L.
13    Q.   Okay.
14    A.   And I have a daughter whose name is Julie
15 Cummings.
16    Q.   How do you spell that last name?
17    A.   C-U-M-M-I-N-G-S.
18    Q.   Okay.  Any others?
19    A.   Nope.
20    Q.   We talked about Clifton D. Singleton
21 having an ownership interest in S5 Construction, LLC.
22 Do you know any other companies that he has an
23 ownership interest in?
24    A.   Not that I know of.
25    Q.   How about Patricia Sorrell?  Does she

